IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,

               Plaintiff,                 No. 2:10-cr-00217 KJN

     v.

ADITYA KULKARNI,

               Defendant.        <u>ORDER</u>

_____/

        Presently before the court is defendant's motion to suppress evidence seized from his vehicle, and statements made by him, during an investigatory stop and search of his vehicle. (Dkt. No. 7.)  Defendant seeks to suppress evidence of marijuana and an open container of alcohol found in his vehicle.  Defendant also seeks to suppress his potentially incriminating statements that could be construed as an admission regarding ownership of the marijuana and alcohol at issue.  On November 1, 2010, the court held an evidentiary hearing regarding defendant's motion, at which the following witnesses testified: Officer Robert Staton, Officer Jeremiah Baculpo, and defendant.  (Dkt. No. 15.)

        For the reasons that follow, the undersigned will grant defendant's motion to suppress in part, and deny it in part.  Specifically, the undersigned will not suppress evidence of the marijuana and open container of alcohol found in defendant's vehicle because the

1    investigatory stop and search of the vehicle did not violate the Fourth Amendment of the United

2    States Constitution.  However, the undersigned will suppress defendant's statements related to

3    the marijuana and the open container of alcohol because those statements were obtained from

4    defendant during a custodial interrogation and in the absence of constitutionally required

5    <u>Miranda</u> warnings.

6    I.       <u>BACKGROUND</u>

7             A.       <u>Observation of the Suspicious Vehicle and the Initial Questioning</u>

8                      On April 17, 2010, at approximately 6:45 p.m., Officer Robert Staton and Officer

9    Enrique Badoy, who are law enforcement officers at the Tracy Defense Depot, observed a white

10   sedan making a "u-turn" at the truck gate entrance to the Tracy Defense Depot.[1]  The Tracy

11   Defense Depot is a military or Department of Defense installation.  After the vehicle executed the

12   u-turn at the truck gate entrance, it pulled into the outer parking lot of the depot, which is

13   adjacent to the outer chain-linked fence that runs the length of the depot.  The outer parking lot is

14   on depot property.  There are limited entry points into the outer parking lot from the public street,

15   and the remainder of the parking lot is lined by a three-cable fence that is approximately three to

16   four feet high.  After the vehicle entered the outer parking lot, it stopped, and a passenger quickly

17   exited the vehicle.  The individual ran to the outer fence line of the depot, bent over, quickly

18   returned to the vehicle, and then the vehicle departed.  This same maneuver was observed a total

19   of three times in a 15-to-20 minute period.

20                     After the second such occurrence, Officer Staton and Officer Jeremiah Baculpo, a

21   patrol officer, were dispatched to the outer parking lot and fence line to investigate the suspicious

22   activity.  The officers checked up and down both sides of the fence line to, among other things,

23   verify whether anything had been left at or thrown over the outer fence.  They did not find

24   ──────────────────

25         [1]  Officer Staton testified that it is not unusual for vehicles to make u-turns at the truck
     gate because of the traffic patterns attendant to the area.  However, he testified that it is unusual
26   for vehicles to make such u-turns more than once in a relatively short period of time.

                                                      2

1   anything unusual or suspicious, such as items that were left behind or evidence of tampering with

2   the fence.

3           When the white sedan approached the outer parking lot for a third time, five or so

4   minutes after the second such occurrence,[2] Officers Staton and Baculpo responded to the scene in

5   their respective law enforcement sport utility vehicles ("SUVs").  Officer Staton arrived at the

6   scene slightly before Officer Baculpo, and Officer Staton activated his overhead lights.  Officer

7   Staton parked his SUV behind the white sedan so that the sedan could not back up, and Officer

8   Baculpo parked his SUV along the driver's side of the sedan.

9           Officer Staton testified that when he approached the scene, he observed that there

10  were three occupants in the vehicle and that one of the three occupants, Nihad Nizar, had already

11  exited the vehicle and was retrieving a soccer ball from the fence line.  As Mr. Nizar returned to

12  the vehicle, Officer Staton ordered Mr. Nizar to stop, to not re-enter the vehicle, and to put the

13  soccer ball down.  Officer Staton then ordered Mr. Nizar to move away from the vehicle and

14  return to the fence line area and face the fence.  Officer Staton testified that he had to repeat his

15  commands to Mr. Nizar that Mr. Nizar stop what he was doing and not return to the vehicle.

16  Officer Staton testified that he thought Mr. Nizar "was not really sure" about what was

17  happening at that point.

18          As Officer Staton was providing commands to Mr. Nizar, Officer Baculpo arrived

19  at the scene.  Officer Baculpo did not immediately observe the soccer ball on the ground, but saw

20  Mr. Nizar moving quickly toward the fence line.  Officer Baculpo ordered Mr. Nizar to stop what

21  he was doing, but Mr. Nizar did not immediately comply with the order.  This failure to comply,

22  and the fact that Officer Baculpo could not see the front of Mr. Nizar's waistband where a

23  weapon could be concealed, raised Officer Baculpo's security concerns and caused Officer

24  Baculpo to draw his 9mm handgun and carry it "in the alternative position," i.e., pointed to the

25  

26  _____

       [2]  Officer Staton's written report states that this third occurrence took place around
7:02 p.m.

1   ground.  Officer Baculpo ordered Mr. Nizar to place his hands over his head and walk backwards

2   toward Officer Baculpo, and Mr. Nizar complied.  Officer Baculpo then holstered his weapon,

3   handcuffed Mr. Nizar, and performed a frisk of Mr. Nizar's outer clothing.  Officer Baculpo

4   found no weapons or contraband.

5       Meanwhile, Officer Staton secured the driver of the vehicle, Deepak Kalshan, and

6   the defendant, who were still inside the vehicle.[3]  Officer Staton ordered defendant and Mr.

7   Kalshan to show their hands and then ordered defendant to exit the vehicle.  He subsequently

8   ordered Mr. Kalshan out of the vehicle and separated the men by approximately eight feet.  Both

9   men exited the vehicle with their hands raised, which resulted in the driver's side door being left

10  open.  Officer Staton frisked defendant and Mr. Kalshan for weapons, handcuffed both men, and

11  ordered them to sit next to Mr. Nizar, who was already seated on the ground.  Officer Staton did

12  not find any weapons on the person of either defendant or Mr. Kalshan, and both men complied

13  with Officer Staton's commands.  Ultimately, the three men were seated in a row on the ground,

14  still in handcuffs.

15      Officer Baculpo conducted interviews of the three men to ascertain who the men

16  were and why they were engaged in the observed, suspicious behavior.  The men reported that

17  they were attending a family gathering or barbeque at a home in a residential neighborhood that

18  was west of, and across a busy street from, the depot.  Defendant was not from the immediate

19  geographic area; he was visiting from the San Francisco Bay Area.  The men informed Officer

20  Baculpo that they had been playing soccer in the backyard of a residence where the gathering was

21  being held and had repeatedly kicked a soccer ball over a 12-foot-high retaining wall or sound

22  wall, across the busy road, and onto depot property.  The ball reportedly rolled to approximately

23  the same point along the outer fence line each time it cleared the wall.  During the investigatory

24

25     [3]  At the evidentiary hearing, defendant testified that he believed that Officer Baculpo,
    and not Officer Staton, handcuffed him.  This factual difference is not material to the resolution

26  of defendant's motion to suppress.

4

1    stop, Officers Staton and Baculpo observed a soccer ball near the fence line, which was

2    consistent with the story provided by the three men.

3              The officers attempted to verify the identities of the three men during the stop.

4    The officers confirmed that defendant had a valid driver's license and had no outstanding

5    warrants and no recorded violations.  Officer Baculpo also learned that defendant was the son of

6    the registered owner of the vehicle; defendant testified that he is the primary operator of the

7    vehicle.  Officer Baculpo also ascertained that defendant was a flight instructor at the Bel-Air

8    International flight school in Belmont, California, in the San Francisco Bay Area.  Mr. Kalshan

9    and Mr. Nizar were defendant's students at the school.

10             Mr. Nizar was identified verbally and had no identification on his person.  The

11   officers determined that the driver, Mr. Kalshan, did not have a valid California driver's license;

12   he only had a New Delhi, India driver's license.  During the interviews, Captain Randal Beck

13   arrived on the scene and suggested that the California Highway Patrol ("CHP") might be able to

14   run Mr. Kalshan's driver's license.  CHP Officer Plante arrived at the scene.  Officer Plante was

15   not able to run Mr. Kalshan's license.  Mr. Kalshan was later cited for violation of California

16   Vehicle Code §12500(a) for driving with an invalid license.

17        B.    The Vehicle Search and Subsequent Questioning

18             Officer Staton testified that while Officer Baculpo was conducting the interviews

19   of defendant, Mr. Kalshan, and Mr. Nizar described above, Officer Staton conducted a "plain

20   view search" of the white sedan, the door of which remained open after defendant and Mr.

21   Kalshan exited the vehicle.[4]  Officer Staton testified that he conducted this search of the interior

22

23        _____

          [4]  In defendant's moving papers, he pointed out discrepancies between reports prepared
     by Officers Staton and Baculpo as they pertained to Officer Staton's basis for searching the
24   vehicle.  Officer Staton's and Officer Baculpo's testimony at the evidentiary hearing clarified that
     Officer Baculpo was misinformed or made an incorrect assumption as to Officer Staton's basis
25   for conducting the search.  The undersigned will rely on Officer Staton's testimony, to the extent
     necessary and permissible, because Officer Staton was the officer who actually conducted the
26   search.

                                    5

1   of the vehicle to check whether there were weapons or anything else in the vehicle, such as

2   explosives or suspicious packages, which were easily accessible and would pose a danger to the

3   officers.  Officer Staton conducted this search after the three men had been frisked and after

4   hearing the story about kicking the soccer ball over the retaining wall or sound wall.

5            In conducting the "plain view search," Officer Staton positioned himself in the

6   space between the open driver's side door and the body of the car.  He used a flashlight to look

7   into the interior of the vehicle.  As Officer Staton leaned over and looked in the door pocket of

8   the driver's side door[5] with the flashlight, he observed a brown, translucent prescription pill

9   bottle with an opaque, white lid.[6]  Officer Staton testified that the bottle had no labels affixed to

10  it and was standing upright in the door pocket, with no objects immediately adjacent to it that

11  would obstruct the view of the bottle.  He also testified that he could see into the bottle well

12  enough to see that the bottle contained something other than medication.  Without touching the

13  bottle, Officer Staton observed a "bulky" or "lumpy" substance or a "shadowy clump" in the

14  bottle.  This observation, along with the fact that there was no label on bottle and that in Officer

15  Staton's training and experience these types of bottles are used to transport substances like

16  marijuana, raised his suspicions that the substance was marijuana or some other controlled

17  substance.  Officer Staton testified that he did not immediately know the exact nature of the

18  substance.  Based on his suspicions, however, Officer Staton picked the prescription pill bottle

19  up, shook the bottle, opened the bottle, and smelled its contents.  Officer Staton testified that,

20  based on his experience and training, the substance smelled like marijuana.  Officer Staton

21  concluded that the bottle contained marijuana in its compressed, "bud" form.  After discovering

22

23        [5] Officer Staton testified that the door was not a soft, collapsible or closed pocket; it was
      an open, hard door pocket.

24        [6] Officer Staton took a photograph of the prescription pill bottle and its contents, which
      was admitted into evidence as the government's Exhibit 4.  Officer Staton repeatedly testified
25    that the bottle was brown and "opaque."  However, the government's Exhibit 4 clearly reflects
      that although the white cap of the bottle is opaque, the body of the bottle is lightly tinted brown
26    and translucent, not opaque.  Officer Staton's use of the word "opaque" was erroneous.

1    what he believed to be marijuana in the prescription pill bottle, Officer Staton showed the

2    substance to CHP Officer Plante, who agreed that the substance was marijuana.

3          Officer Staton testified that he then "used" the discovery of marijuana as probable

4    cause to search the passenger compartment of the vehicle.  He discovered the following inside

5    the vehicle: (1) a white, plastic "Airborne" brand medication tube or vile with trace amounts of

6    marijuana in it; (2) rolling papers, which were found in the center console of the vehicle; (3) "a

7    roller"; and (4) an open, partially consumed bottle of scotch, which was wrapped in a brown

8    paper bag and found in the seat pocket behind the front passenger's seat.  Officer Staton and

9    Officer Baculpo testified that they did not smell marijuana or alcohol at all prior to searching the

10   vehicle.

11         After finding the items described above, Officer Staton further interviewed the

12   men without providing any <u>Miranda</u> warnings.[7]  Officer Staton testified that because he assumed

13   that the drugs belonged to the driver, he approached the driver first.  Officer Staton further

14   testified that as he asked the driver, Mr. Kalshan, about the marijuana, he viewed defendant out

15   of the corner of his eye "drop his head and shake it," in effect indicating resignation about the

16   drugs.  Thus, before obtaining a response from Mr. Kalshan, Officer Staton approached

17   defendant and inquired whether defendant would like to tell him to whom the drugs belonged.

18   Officer Staton and defendant testified that defendant responded that the marijuana "was kind of

19   everybody's marijuana," which had been purchased to be used later at a party.  Officer Staton

20   testified that he informed defendant of his assumption that the drugs belong to the driver because

21   of the location of the drugs.  He testified that in response, defendant stated that because the

22   marijuana was technically found in his vehicle, he would take responsibility for the marijuana.

23

24         [7]  The testimony provided at the hearing confirmed that at no point during the entire
     encounter were defendant, Mr. Kalshan, or Mr. Nizar provided with <u>Miranda</u> warnings.  As
25   discussed further below, Officer Staton testified that he did not provide Miranda warnings
     because the suspects were never under arrest.  He later testified, however, that had the quantity of
26   marijuana been greater, such as one pound, he would have provided <u>Miranda</u> warnings before
     asking any questions of the three men.

                                         7

1    Defendant's testimony is in accord.

2            Defendant's effective ownership of the vehicle and assumption of responsibility

3    for the marijuana contained therein also served as the basis for attributing ownership of the open

4    container of alcohol to defendant.  However, defendant testified that he did not know that the

5    alcohol was in the vehicle, and defendant and Officer Staton testified that defendant never

6    expressly accepted responsibility for the alcohol found in the vehicle.

7            Towards the end of the encounter, friends and family of the detained men

8    approached the scene and began questioning the officers about the incident.  The officers

9    informed the friends and family that the men would be released soon and directed the bystanders

10   to go back across the street.  Defendant's vehicle was towed from the scene, and the three men

11   were ultimately released.

12           Defendant, Mr. Kalshan, and Mr. Nizar remained in handcuffs during the latter

13   round of questioning about the marijuana and alcohol found in the vehicle.  However, there is a

14   discrepancy regarding how much time defendant spent in handcuffs.  Officer Baculpo testified

15   that the men were not taken out of handcuffs until near the end of the investigation, and

16   defendant and Officer Baculpo testified that defendant was in handcuffs for over one hour.

17   However, Officer Staton testified that defendant was in handcuffs for approximately 20 minutes,

18   and based that testimony on his review of his written report while on the stand and his

19   recollection that defendant was out of handcuffs by the time the towing company arrived.  Aside

20   from the differences between the witnesses' respective testimony, there is a discrepancy between

21   the officers' respective written reports in this regard.  Officer Staton's report states that the

22   towing company arrived at the scene at approximately 7:30 p.m.; that defendant, Mr. Kalshan,

23   and Mr. Nizar were "released" at approximately 7:45 p.m.; and that the towing company left the

24   scene with the vehicle at approximately 7:50 p.m.  Officer Baculpo's report, however, states that

25   the family and friends of the men arrived at approximately 8:13 p.m., and suggests that the

26   towing company left *after* those friends and family were told to leave the scene.  The undersigned

will assume for the purposes of this motion to suppress that defendant was in handcuffs for over an hour, although the length of time that defendant was in handcuffs is not dispositive of defendant's motion.

C.   Procedural History

On June 8, 2010, the government filed an information charging defendant with: (1) a misdemeanor violation of 21 U.S.C. § 844(a) for knowingly and intentionally possessing a Schedule I controlled substance, i.e., marijuana; and (2) possession of an open container of alcohol in his vehicle in violation of 18 U.S.C. § 13 and California Vehicle Code § 23223(b), an infraction.  (Information at 1-2, Dkt. No. 1.)  On August 4, 2010, defendant filed the pending motion seeking to suppress, and the government filed a written opposition.  At a hearing held on September 1, 2010, the undersigned ordered that an evidentiary hearing be held as to defendant's motion to suppress, and that evidentiary hearing took place on November 1, 2010.

II.   DISCUSSION

Defendant forwards several grounds in support of suppression of the physical evidence and his statements related thereto.  The undersigned addresses each in turn.

A.   The Initial Seizure and "Pat-Down" of Defendant Was Not Unconstitutional

Defendant first argues that his Fourth Amendment rights were violated when Officers Staton and Baculpo initially stopped the vehicle that defendant was traveling in, and detained, patted down, and handcuffed defendant and his students.  He contends that the officers lacked a reasonable, articulable suspicion that defendant or his students were armed, dangerous, or engaged in criminal activity.  The undersigned is unpersuaded by defendant's contention.

"The Fourth Amendment prohibits 'unreasonable searches and seizures' by the Government, and its protections extend to brief investigatory stops of persons or vehicles that fall short of traditional arrest."  United States v. Willis, 431 F.3d 709, 714 (9th Cir. 2005) (quoting United States v. Arvizu, 534 U.S. 266, 273 (2002)) (internal quotation marks omitted).  Such an investigatory stop is justified where a law enforcement officer has a "reasonable suspicion" that

9

1   criminal activity may be afoot.  Arvizu, 534 U.S. at 273.  "The 'touchstone of the Fourth

2   Amendment is reasonableness.'"  Willis, 431 F.3d at 714 (quoting Florida v. Jimeno, 500 U.S.

3   248, 250 (1991)).  "To constitute reasonable suspicion, the officer's belief that criminal activity

4   is afoot must be supported by 'specific and articulable facts which, taken together with rational

5   inferences from those facts, reasonably warrant th[e] intrusion.'"  United States v. Drake, 543

6   F.3d 1080, 1088 (9th Cir. 2008) (modification in original) (quoting Terry v. Ohio, 392 U.S. 1, 21

7   (1968)).  In determining whether a reasonable suspicion exists, the court "must look at the

8   'totality of the circumstances' . . . to see whether the detaining officer has a 'particularized and

9   objective basis' for suspecting legal wrongdoing."  Arvizu, 534 U.S. at 273; accord United States

10  v. Palos-Marquez, 591 F.3d 1272, 1274-75 (9th Cir. 2010) ("To determine whether a stop was

11  supported by reasonable suspicion, we consider whether, in light of the totality of the

12  circumstances, the officer had a particularized and objective basis for suspecting the particular

13  person stopped of criminal activity" (citation and quotation marks omitted).).  Although an

14  officer's mere "hunch" is insufficient to justify a stop, the assessment of reasonable suspicion

15  permits an officer to "draw on [his or her] own experience and specialized training to make

16  inferences from and deductions about the cumulative information available to [him or her] that

17  'might well elude an untrained person.'"  Arvizu, 534 U.S. at 273-74 (citation omitted).

18          Before reaching the issue of reasonable suspicion, the undersigned addresses

19  defendant's separate argument that defendant was "seized" within the meaning of the Fourth

20  Amendment when Officers Staton and Baculpo stopped the vehicle and detained defendant, Mr.

21  Kalshan, and Mr. Nizar.  "A seizure occurs when a law enforcement officer, through coercion,

22  'physical force[,] or a show of authority, in some way restricts the liberty of a person.'"  United

23  States v. Washington, 387 F.3d 1060, 1068 (9th Cir. 2004) (quoting United States v.

24  Chan-Jimenez, 125 F.3d 1324, 1325 (9th Cir.1997)).  In turn, "[a] person's liberty is restrained

25  when, 'taking into account all of the circumstances surrounding the encounter, the police conduct

26  would have communicated to a reasonable person that he was not at liberty to ignore the police

10

1    presence and go about his business.'" Id. (quotation marks omitted) (quoting Florida v. Bostick,

2    501 U.S. 429, 437 (1991)).  Here, the contention that defendant and the other two occupants of

3    the vehicle were seized as a result of being stopped, detained, and handcuffed during the

4    investigation seems beyond dispute, and the government does not disagree with defendant's

5    general contention that the three men were seized by Officers Staton and Baculpo.  However,

6    "[a] seizure premised on reasonable suspicion, such as a Terry-stop, is not per se unconstitutional

7    under the Fourth Amendment, so long as it is sufficiently brief and minimally intrusive."

8    Washington, 387 F.3d at 1069.  The parties disagree regarding whether the officers had the

9    requisite reasonable suspicion to detain the men and whether the officers impermissibly extended

10   the duration of the detention.

11          The undersigned concludes that the officers had a reasonable suspicion that

12   supported the initial stop of the vehicle and the initial detention of defendant, Mr. Kalshan, and

13   Mr. Nizar.  This conclusion is necessarily informed by the fact that the events at issue took place

14   at the outer fence line of what Officer Staton testified is a military or Department of Defense

15   installation.  Law enforcement officers observed the same white sedan turn into the same area of

16   the outer parking lot adjacent to the outer fence line of the depot three times over the course of 15

17   to 20 minutes.  Each time, the officers observed that an individual exited the vehicle, ran to the

18   fence line, and returned to the vehicle, which then departed the scene.  Officer Staton testified

19   credibly that the repetition of this maneuver three times over a relatively short period of time

20   raised suspicions that the occupants of the vehicle might be attempting to breach the fence line,

21   deposit a harmful device on the property, or practice "dry runs" to check for law enforcement

22   response in preparation for a future attempt to breach the fence line or engage in other criminal

23   activity relative to the depot.  These facts support that the officers had a reasonable suspicion that

24   criminal activity might be afoot.  It is of no matter that Officers Staton and Baculpo found

25   nothing unusual at the fence line upon investigation after the vehicle was seen making this

26   suspicious maneuver for the second time.  Officer Staton testified convincingly that his

1    suspicions remained justifiably raised despite finding nothing unusual upon inspection.

2              Defendant also argues that Officer Staton violated defendant's Fourth Amendment

3    rights by handcuffing defendant and conducting a pat-down search or <u>Terry</u> frisk of defendant

4    after defendant exited the vehicle.[8]   Initially, to the extent that defendant argues that it was

5    constitutionally impermissible for Officer Staton to order defendant and Mr. Kalshan out of the

6    vehicle, such an argument fails.   The Supreme Court has plainly held that a law enforcement

7    officer may "as a matter of course" order the driver and passengers of a lawfully stopped car to

8    exit the vehicle.  <u>Maryland v. Wilson</u>, 519 U.S. 408, 410 (1997).

9              "To justify a patdown of the driver or a passenger during a traffic stop . . . , just as

10   in the case of a pedestrian reasonably suspected of criminal activity, the police must harbor

11   reasonable suspicion that the person subjected to the frisk is armed and dangerous."  <u>Arizona v.</u>

12   <u>Johnson</u>, 129 S. Ct. 781, 784 (2009); <u>see also</u> <u>United States v. Johnson</u>, 581 F.3d 994, 999 (9th

13   Cir. 2009) ("If an officer reasonably suspects the individual may be armed and dangerous, the

14   officer may 'frisk' the person he has stopped to determine if the individual is carrying any

15   weapons.").  "This frisk is limited to a patdown of the exterior clothing."  <u>Johnson</u>, 581 F.3d at

16   999.  To determine whether reasonable suspicion existed to support a frisk or pat-down search in

17   the context of a lawful investigatory stop, the court considers the totality of the circumstances

18   surrounding the stop.  <u>United States v. Burkett</u>, 612 F.3d 1103, 1107 (9th Cir. 2010).

19             Here, Officers Staton and Baculpo did not violate defendant's constitutional rights

20   by patting him down to search for weapons because Officer Staton reasonably suspected that

21

22

23
        ─────────────────
24        [8]  Defendant collectively argues the issue of being patted down and handcuffed in
     reference to whether a reasonable suspicion supported the detention and the <u>Terry</u> frisk.  He does
25   not separately argue that his constitutional rights were violated by the use of handcuffs alone.
     The undersigned will address the use of handcuffs below to the extent that it is relevant to
26   defendant's argument that the officers should have provided defendant with <u>Miranda</u> warnings
     during the stop.

1  defendant could be armed and dangerous.[9]  As stated above, law enforcement personnel at the

2  defense depot reasonably suspected that defendant was engaged in criminal activity at the fence

3  line of the defense depot, and this criminal activity included a potential breach of a military

4  installation.  See Johnson, 581 F.3d at 1000 (concluding that officers' suspicion that a bank

5  robbery was about to take place justifiably supported the officers' increased suspicion that the

6  three suspects were armed and dangerous); United States v. Flatten, 456 F.3d 1154, 1158 (9th

7  Cir. 2006) (stating that the nature of the crime suspected, and its association with the use of

8  weapons, is a relevant consideration in assessing whether there is a reasonable suspicion to

9  believe that a suspect is armed and dangerous).  Moreover, the suspects here initially

10  outnumbered the responding officers three to two and, accordingly, Officers Staton and Baculpo

11  justifiably conducted a pat-down search of defendant and his companions out of concern for

12  officer safety.  See, e.g., Johnson, 581 F.3d at 1000 (concluding that officers were justified, for

13  their own safety, in conducting a frisk of a suspect where the suspects outnumbered the officers

14  by three to two).  Finally, the behavior of Mr. Nizar supported Officer Staton's and Officer

15  Baculpo's reasonable belief that the three men were armed and dangerous.  When Officer Staton

16  approached the scene and Mr. Nizar, who was already outside of the vehicle, Officer Staton had

17  to repeat his orders to Mr. Nizar.  Officer Staton credibly testified that he had to repeat his

18  commands to Mr. Nizar to stop what he was doing, put the soccer ball down, and not return to

19  the vehicle.  Additionally, Officer Baculpo credibly testified that when he arrived and attempted

20  to secure Mr. Nizar, he, too, was forced to repeat his commands and even felt the need to briefly

21  draw his weapon and carry it pointed to the ground.[10]  Moreover, Officer Baculpo testified that he

22

23  [9]  Defendant has not suggested that Officer Staton, who was the officer that frisked
    defendant, conducted the actual pat-down search in a constitutionally impermissible manner.

24

25  [10]  Officer Staton testified that defendant, Mr. Kalshan, and Mr. Nizar appeared to be
    confused by the entire situation.  This might provide an innocuous reason for why Officers Staton
    and Baculpo were forced to repeat their commands.  Nevertheless, the undersigned finds the need
26  to repeat commands relevant to whether Officer Staton reasonably suspected the men of being

13

1  could not see the front waistband of Mr. Nizar's pants, which caused Officer Baculpo concern

2  regarding possible possession of a weapon.  All of these facts, taken together, support the

3  conclusion that Officer Staton harbored a reasonable suspicion that defendant was armed and

4  dangerous and that the frisk of defendant was justified.

5          The undersigned is unpersuaded by defendant's argument that Officer Staton's

6  suspicion that the three suspects posed a threat to the depot should have been dispelled by the

7  fact that Officer Staton saw the soccer ball upon arriving at the scene, which allegedly should

8  have alerted Officer Staton that, as the argument goes, the suspects were engaged in innocuous

9  behavior.  Officer Staton testified that his suspicions remained high despite seeing the soccer

10  ball, and this was reasonable in light of the fact that the officers suspected the three men of,

11  among other things, performing "dry runs" for a future breach of the depot.  Based on the

12  information available to the officers at the time of the pat-down search, Officers Staton and

13  Baculpo had an objectively reasonable suspicion that criminal activity involving a weapon was

14  afoot, and, accordingly, the presence of the soccer ball was largely immaterial.  See Burkett, 612

15  F.3d at 1107 (explaining that the truth of a defendant's innocent explanation for his conduct is

16  immaterial when an officer's observations provided an objectively reasonable basis for

17  suspecting that the defendant had a weapon); accord Johnson, 581 F.3d at 1000 (stating that a

18  defendant's innocent explanation for his conduct was immaterial to the suppression motion

19  where "the officers possessed substantial information supporting a reasonable suspicion that

20  criminal activity was afoot and that weapons might be involved").

21          B.    The Officers Did Not Impermissibly Extend the Stop

22          Next, defendant argues that the officers prolonged the stop beyond its permissible

23  scope.  Specifically, defendant contends that the officers had no further basis, i.e., reasonable

24  suspicion, to further detain defendant and his students in handcuffs after the officers had seized

25  ─────────────────────

26  armed and dangerous in the moment and under the totality of the circumstances.

1   the men, patted them down, and determined that the story regarding the soccer ball was

2   consistent with the officers' observations.  Thus, according to defendant, the officers extended

3   the search beyond its permissible scope by questioning defendant after the time that the officers

4   should have been satisfied that the suspicious behavior at issue was innocuous.  The undersigned

5   does not agree with defendant's assessment.[11]

6           "[A]n investigative detention must be temporary and last no longer than is

7   necessary to effectuate the purpose of the stop."  Florida v. Royer, 460 U.S. 491, 500 (1983)

8   (stating also that the "scope of the intrusion permitted will vary to some extent with the particular

9   facts and circumstances of each case").  In United States v. Sharpe, the Supreme Court stated that

10  "[i]n assessing whether a detention is too long in duration to be justified as an investigative stop,

11  we consider it appropriate to examine whether the police diligently pursued a means of

12  investigation that was likely to confirm or dispel their suspicions quickly, during which time it

13  was necessary to detain the defendant."  470 U.S. 675, 686 (1985).  Moreover, "[a]n officer's

14  inquiries into matters unrelated to the justification for the traffic stop . . . do not convert the

15  encounter into something other than a lawful seizure, so long as those inquiries do not

16  measurably extend the duration of the stop."  Arizona v. Johnson, 129 S. Ct. 781, 788 (2009)

17  (citing Muehler v. Mena, 544 U.S. 93, 100-01 (2005)).  Additionally, the Ninth Circuit Court of

18  Appeals has held that an officer does not need independent reasonable suspicion to ask questions

19  unrelated to an initially lawful investigative stop where such questioning does not "unreasonably

20  prolong the duration of the stop."  United States v. Turvin, 517 F.3d 1097, 1103-04 (9th Cir.

21  2008).

22          Here, the undersigned concludes that Officers Staton and Baculpo diligently

23  investigated defendant's and the other men's suspicious behavior along the depot's fence line

24  _____

25      [11]  As discussed below, the reason for the stop ultimately changed from one of base
    security to one based upon the discovery of the marijuana and alcohol, and such lawful discovery
26  justified a somewhat extended, not impermissibly long, investigative detention.

1    such that the officers did not impermissibly extend the investigative stop.  Approximately 20

2    minutes elapsed between the time Officers Staton and Baculpo responded to the scene and the

3    time Officer Staton discovered the marijuana in the vehicle.  Nothing about the witnesses'

4    testimony suggests that the officers acted in a dilatory manner in initially questioning defendant

5    and the two other men to determine the nature of the suspects' activity in the depot's outer

6    parking lot.  Moreover, the undersigned will not draw an artificial line at which time the officers

7    were required to be satisfied with the suspects' story as a matter of law.  Furthermore, the

8    discovery of the marijuana in the vehicle, which occurred while Officer Baculpo was

9    interviewing defendant, Mr. Kalshan, and Mr. Nizar, provided the officers with additional,

10   permissible grounds to extend the stop.  The undersigned turns to the legality of the discovery of

11   the marijuana next.

12        C.    Officer Staton's Search of Defendant's Vehicle Was Constitutionally Permissible

13             Defendant argues that Officer Staton's discovery of the marijuana inside the

14   translucent prescription pill bottle inside the door pocket of the vehicle was unconstitutional

15   because Officer Staton did not have probable cause to search the vehicle and the incriminating

16   nature of the substance inside of the bottle was not immediately apparent.  The government

17   contends that Officer Staton discovered the marijuana pursuant to a permissible "plain view

18   search" of the vehicle.

19             Under certain circumstances, law enforcement officers may seize evidence that is

20   discovered in plain view.  As a general matter, "[t]o satisfy the plain view doctrine: (1) the

21   officer must be lawfully in the place where the seized item was in plain view; (2) the item's

22   incriminating nature was 'immediately apparent;' and (3) the officer had 'a lawful right of access

23   to the object itself.'"  United States v. Wong, 334 F.3d 831, 838 (9th Cir. 2003) (citing Horton v.

24   California, 496 U.S. 128, 136-37 (1990)).

25             At the outset, the undersigned addresses the government's counsel's and Officer

26   Staton's characterizations of the search at issue here as a permissible "plain view search."  Any

16

reference to a plain view *search* is misleading in that the plain view doctrine does not provide for an independent basis by which law enforcement may gain access to an otherwise private space to *search*—it is a permissible means of *seizing* evidence discovered while lawfully in the place searched.  As the Supreme Court explained in <u>Horton</u>, "[i]f 'plain view' justifies an exception from an otherwise applicable warrant requirement, therefore, it must be an exception that is addressed to the concerns that are implicated by seizures rather than by searches."  496 U.S. at 134.  In any event, although Officer Staton testified that he conducted a "plain view search" of defendant's vehicle, his testimony revealed that what he conducted was in fact a protective search of the vehicle to check for weapons or other materials that could pose a danger to the officers.  It is this protective search that potentially supports Officer Staton's lawful presence at the open car door when he viewed the prescription bottle.

The first element of the plain view seizure doctrine asks whether the officer was lawfully in the place where he or she encountered the seized item in plain view.  Here, Officer Staton testified that while Officer Baculpo continued his interviews of defendant, Mr. Kalshan, and Mr. Nizar, Officer Staton began searching the vehicle for any weapons or other items in plain sight that might be within easy access and pose a danger to the officers.  Officer Staton testified that he was also performing a cursory search for any potentially dangerous packages or explosives.  Under the specific facts of this case, Officer Staton's search was a permissible protective search or "frisk" of the vehicle's passenger compartment.[12]  In <u>Michigan v. Long</u>, the Supreme Court held that "the search of the passenger compartment of an automobile, limited to

---

[12]  At the evidentiary hearing, the court raised the issue of whether it was material to the plain view analysis that the door of the vehicle at issue was left open because defendant and Mr. Kalshan were ordered out of the vehicle with their hands raised and, thus, the men could not have closed the door.  First, given the unique circumstances of this case, it was reasonable for the officers to order the vehicle's occupants to exit the vehicle with their hands raised.  Therefore, the officers did not artificially create a situation whereby the car door would be left open.  Second, because the undersigned concludes that Officer Staton conducted a constitutionally permissible protective search, it is not material under these facts that the door was left open as a result of Officer Staton's law enforcement command, as opposed to the inadvertence or choice of defendant and Mr. Kalshan.

those areas in which a weapon may be placed or hidden, is permissible if the police officer

possesses a reasonable belief based on 'specific and articulable facts which, taken together with

the rational inferences from those facts, reasonably warrant' the officers in believing that the

suspect is dangerous and the suspect may gain immediate control of weapons."  463 U.S. 1032,

1049-50 (1983) (citing Terry, 392 U.S. at 21); accord Haynie v. County of Los Angeles, 339 F.3d

1071, 1076-77 (9th Cir. 2003).  Here, Officer Staton reasonably concluded that defendant and his

students might be armed and dangerous and that there was reason to conduct a protective search

of the passenger compartment of the vehicle to check for easily accessible weapons or other

items that might be dangerous to the officers.  This protective search was particularly reasonable

in this case, where the suspected criminal activity was a possible threat or breach of a military

facility.  Officer Staton's suspicions remained heightened even after hearing the suspects'

explanation about attending a family gathering and errantly and repeatedly kicking a soccer ball

over the 12-foot high sound wall to almost the same location along the fence, and Officer Station

was not required to accept the innocent explanation as true insofar as his protective search was

concerned.  Accordingly, the undersigned concludes, on the basis of the specific facts of this

case, that Officer Staton was lawfully situated in a position to view the prescription bottle.[13]

       Turning to the second aspect of the plain view doctrine, defendant argues that the

incriminating nature of the substance in the prescription bottle was not immediately apparent to

---

[13]  Although defendant has not argued as much, the undersigned has some concern
regarding whether Officer Staton's conduct falls outside of the holding in Long because
defendant, Mr. Kalshan, and Mr. Nizar were handcuffed and located several feet away from the
vehicle when Officer Staton searched the vehicle.  These circumstances raise a question whether
the three suspects could have gained immediate control of weapons consistent with the holding in
Long.  Nevertheless, this concern is mitigated by the Supreme Court's discussion in Long, where
the Court indicated that a protective search of a passenger compartment of a vehicle would be
permissible where the subject of the investigative stop who was believed to be armed and
dangerous would be permitted to return to his or her vehicle and potentially gain access to
weapons.  See Long, 463 U.S. at 1051-52.  The Court's discussion supports Officer Staton's
protective search of the passenger compartment on the particular facts of this case.  Admittedly
the defendant's car herein was eventually towed, but that situation presumably would not have
occurred if the drugs and alcohol had not been found, and the defendant and passengers could
have returned to the vehicle.

1    Officer Stanton.  Although the incriminating character of the evidence encountered in plain view

2    must be immediately apparent, the officer need not be certain that the evidence is contraband in

3    order to seize it under the plain view doctrine.  See Texas v. Brown, 460 U.S. 730, 741 (1983)

4    (explaining that an officer need not be possessed of near certainty as to the seizable nature of the

5    items discovered); United States v. Stafford, 416 F.3d 1068, 1076 (9th Cir. 2005) ("This standard

6    does not require the officers to *know* that the item seized is illegal.").  Instead, the "incriminating

7    character" of the object is "immediately apparent" if the officer has probable cause to believe that

8    the object is contraband, i.e., probable cause to associate the object with criminal activity.  See

9    Minnesota v. Dickerson, 508 U.S. 366, 375 (1993); accord Brown, 460 U.S. at 742; see also

10   Stafford, 416 F.3d at 1076 ("The second requirement of the plain view exception, that the

11   incriminating nature of the evidence be 'immediately apparent,' focuses on whether the officers

12   had 'probable cause to believe they were associated with criminal activity'" (citations omitted).).

13   Probable cause to associate the object with criminal activity requires that the "facts available to

14   the officer would 'warrant a man of reasonable caution in the belief' that certain items may be

15   contraband." Brown, 460 U.S. at 742 (internal citations omitted).  The Ninth Circuit Court of

16   Appeals has stated that the "determination of whether the officers had probable cause to believe

17   that the items seized were illegal, unlawful, or associated with criminal activity is objective, but

18   we apply it to the 'actual and/or perceived belief of the law enforcement officer as he . . . engages

19   in search and seizure.'" Stafford, 416 F.3d at 1076 (modification in original) (citing United

20   States v. Prim, 698 F.2d 972, 975 (9th Cir. 1983)).

21            Here, the undersigned concludes that Officer Staton had probable cause to

22   associate the substance inside of the prescription pill bottle with criminal activity such that the

23   plain view seizure did not offend defendant's Fourth Amendment rights.  Officer Staton testified

24   that he approached the area between the open driver's side door and the body of the vehicle in

25   question, leaned toward the driver's side door pocket, shined his flashlight on the door pocket

26   and viewed a translucent, brown, unlabeled prescription pill bottle with an opaque lid standing

19

1   upright in the door pocket.[14]  He testified that no other objects in the door pocket were in the

2   immediate vicinity of the prescription bottle such that his view of the bottle was obstructed, and

3   the government's Exhibit 4 admitted at the evidentiary hearing reflects that the tint of the bottle

4   (excluding the opaque lid) was faint enough that light could pass through the bottle and a person

5   could see the contents of the bottle.  Officer Staton candidly testified that prior to picking up the

6   prescription pill bottle, opening it, and smelling its contents, he did not "positively" know what

7   the substance inside the prescription bottle was; however, he also testified that he immediately

8   knew that the bottle did not contain prescription medicine or pills.  He described the contents as a

9   "bulky" or "lumpy" substance or a "shadowy clump."  He also testified that the prescription pill

10  bottle raised suspicions—immediately and prior to handling the bottle—that it contained

11  contraband because, based on his law enforcement training and experience: (1) such prescription

12  pill bottles are commonly used to store marijuana, (2) the substance inside the bottle appeared to

13  be marijuana in its "bud" form, and (3) the bottle had no affixed label, which suggested to him

14  that something other than prescription medicine, and likely contraband, was inside the bottle.

15  Indeed, Officer Staton testified that he was "more than reasonably confident" that the

16  prescription pill bottle contained marijuana or some other type of illegal substance prior to

17  touching the bottle.  Based on these facts, the undersigned concludes that Officer Staton had

18  probable cause to associate the substance inside of the prescription pill bottle with criminal

19  activity prior to his handling and manipulation of the bottle.  Accordingly, the undersigned

20

21

22

_____

23      [14]  It is not material to the evaluation of Officer Staton's plain view seizure of the
    prescription pill bottle that Officer Staton leaned over to look into the door pocket and used a
24  flashlight.  See Brown, 460 U.S. at 739-40 (stating that it was "beyond dispute" that the officer's
    action in shining his flashlight to illuminate the interior of the subject vehicle "trenched upon no
25  right secured . . . by the Fourth Amendment" and that the fact that the officer changed position
    and bent down at an angle to see what was inside the vehicle was "irrelevant to Fourth
26  Amendment analysis").

1  concludes that Officer Staton's plain view seizure was constitutionally permissible.[15]

2        D.      The Custodial Interrogation of Defendant Was Unconstitutional

3        Finally, the undersigned addresses defendant's contention that Officer Staton and

4  Officer Baculpo impermissibly obtained incriminatory statements from defendant regarding

5  potential ownership of, or responsibility for, the marijuana and alcohol found in the vehicle

6  because the officers failed to provide Miranda warnings to defendant prior to conducting a

7  custodial interrogation of defendant.  The parties' dispute centers on whether defendant was "in

8  custody" such that the officers were required to provide Miranda warnings.

9        "An officer's obligation to give a suspect *Miranda* warnings before interrogation

10  extends only to those instances where the individual is 'in custody.'"  United States v. Kim, 292

11  F.3d 969, 973 (9th Cir. 2002) (citing Oregon v. Mathiason, 429 U.S. 492, 495 (1977) (per

12  curiam)).  "In determining whether an individual was in custody, a court must examine all of the

13  circumstances surrounding the interrogation, but 'the ultimate inquiry is simply whether there

14  [was] a formal arrest or restraint on freedom of movement of the degree associated with a formal

15  arrest.'"  Stansbury v. California, 511 U.S. 318, 322 (1994) (per curiam) (internal quotation

16  marks omitted, modification in original) (quoting California v. Beheler, 463 U.S. 1121, 1125

17  (1983) (per curiam)); see also Kim, 292 F.3d at 973-74 (stating that the court "must determine

18  whether the officers established a setting from which a reasonable person would believe that he

19  or she was not free to leave") (citation and quotation marks omitted).  "[T]he initial

20  determination of custody depends on the objective circumstances of the interrogation, not on the

21  subjective views harbored by either the interrogating officers or the person being questioned."

22  Stansbury, 511 U.S. at 322.  The Ninth Circuit Court of Appeals has identified several, non-

23  exhaustive factors (sometimes referred to as the "Kim factors") that are "relevant to the custody

24  

25      [15]  Therefore, once Officer Staton lawfully discovered the marijuana he also had probable
cause to search the vehicle thereby eliminating any legal challenges to the subsequent discovery
26  of the alcohol in the vehicle.

1   determination: '(1) the language used to summon the individual; (2) the extent to which the

2   defendant is confronted with evidence of guilt; (3) the physical surroundings of the interrogation;

3   (4) the duration of the detention; and (5) the degree of pressure applied to detain the individual.'"

4   United States v. Bassignani, 575 F.3d 879, 883-84 (9th Cir. 2009) (quoting Kim, 292 F.3d at

5   974).

6           As an initial matter, the undersigned notes that at the evidentiary hearing, the

7   government conceded that the first and fifth factors listed above—the language used to summon

8   the individual and the degree of pressure applied to the detain the individual—"strike against"

9   the government's position regarding defendant's custody status at the time he made the

10  incriminating or potentially incriminating statements at issue.  The government made no such

11  concessions in its written opposition to defendant's motion to suppress.  In any event, the

12  undersigned will address all of the factors below.

13          As the government concedes, the first factor from Kim, the language used to

14  summon defendant, favors a finding that defendant was in custody.  Defendant did not

15  voluntarily approach the officers or voluntarily accompany the officers to any location.  See Kim,

16  292 F.3d at 974 ("In determining whether suspects were 'in custody' for *Miranda* purposes, the

17  Supreme Court has considered whether they voluntarily approached or accompanied law officers

18  understanding that questioning would ensue.") (citations omitted).  To the contrary, Officers

19  Staton and Baculpo approached defendant's vehicle with their overhead lights on, surrounded

20  defendant's vehicle with their SUVs, and directed every movement by the three suspects for

21  approximately one hour.  Although justified in light of the circumstances, Officer Baculpo

22  approached Mr. Nizar with his weapon drawn.  Importantly, the officers' took control of the three

23  men by almost immediately handcuffing them.

24          Second, Officer Staton confronted defendant with evidence of guilt.  Although

25  Officer Staton did not appear to adopt an aggressive, coercive, or deceptive tone, see Bassignani,

26  575 F.3d at 884 ("We have found a defendant in custody when the interrogator adopts an

22

1    aggressive, coercive, and deceptive tone."), there is no dispute that Officer Staton presented the

2    marijuana discovered in the vehicle to defendant and inquired about ownership of the marijuana.

3    Defendant responded that it was kind of everyone's marijuana.  The government makes much out

4    of the fact that Officer Staton stated to defendant that it would be assumed that the drugs

5    belonged to the driver, Mr. Kalshan, and that defendant was therefore never presented with

6    evidence of *his* guilt.  The fact remains, however, that Officer Staton presented the evidence to

7    defendant, and that presentation elicited an incriminating response.  Indeed, Officer Staton

8    approached defendant with the drugs *because* Officer Staton observed defendant drop his head

9    and shake it in defeat when the drugs were presented to Mr. Kalshan.

10           The undersigned notes that although an initial determination of custody does not

11   depend on the subjective views held by the interrogating officers—and does not dispose of the

12   question here—Officer Staton testified that he would have provided <u>Miranda</u> warnings to

13   defendant if the quantity of drugs had been greater.  Officer Staton testified that he would have

14   provided <u>Miranda</u> warnings after finding the drugs but before interrogating defendant had the

15   amount of drugs been greater than an amount consistent with personal use.  Moreover, he

16   testified that he did not provide such warnings because he would have had to obtain approval

17   from a supervisor to do so.  Although not dispositive of the issue, it is at least illuminating that

18   Officer Staton believed that <u>Miranda</u> warnings would have been warranted under the facts of this

19   case if only the amount of drugs were different.

20           Third, the undersigned finds that although the interrogation did not take place in

21   an interrogation room or the back of a police vehicle, the surroundings of the interrogation

22   nonetheless support that defendant was in custody.  Defendant's vehicle was essentially

23   surrounded by two law enforcement SUVs, with activated overhead lights.  Defendant, Mr.

24   Kalshan, and Mr. Nizar were all handcuffed and seated on the ground for all relevant parts of the

25   interrogation.  Although these men were initially secured by only two officers, those officers

26   were subsequently joined by Captain Beck and CHP Officer Plante.  Furthermore, defendant was

1    unfamiliar with the area because he was from a different part of the state, and the sun was setting

2    during the interrogation.  These facts indicate that defendant was not only unfamiliar with his

3    surroundings, but that the police-dominated atmosphere effectively isolated defendant from the

4    outside world.  See Kim, 292 F.3d at 977 (finding that the creation of a "police-dominated

5    atmosphere" in which the defendant was physically isolated from those who could have provided

6    moral support contributed to the finding that the defendant was in custody).  This conclusion is

7    supported by the fact that when friends and family of the three men approached the scene toward

8    the end of the investigatory stop, the officers directed the friends and family away.

9              Fourth, the duration of the detention only slightly favors a finding that defendant

10   was in custody.  Decisions by the Ninth Circuit Court of Appeals have held that interrogations as

11   short as 45 minutes can constitute custodial interrogations, but also that interrogations lasting

12   over an hour might not.  See Bassignani, 575 F.3d at 886 (collecting cases).  Findings regarding

13   whether the duration of the detention points to a custodial situation often depend on the

14   remaining factors.  Here, defendant was detained for just over an hour, and spent much of that

15   time in handcuffs.  However, the actual interrogation of defendant regarding the drugs and

16   alcohol found in the vehicle accounted only for a small fraction of this period.  The undersigned

17   finds that this factor favors a finding that defendant was in custody, especially considering that

18   defendant was restrained for nearly the entire stop.

19             Fifth, and a point conceded by the government, the undersigned concludes that the

20   degree of pressure applied by Officers Staton and Baculpo to detain defendant favors a finding

21   that defendant was in custody.  Upon approaching the scene, Officer Staton ordered defendant to

22   place his hands out of the vehicle's window, open the door from the outside, and exit the vehicle.

23   These facts are not necessarily conclusive insofar as they relate to a custody determination.

24   However, Officers Staton and Baculpo immediately handcuffed defendant, Mr. Kalshan, and Mr.

25   Nizar and left them handcuffed and seated on the ground for the majority of the detention,

26   including during questioning.  Moreover, at no time during the detention and interrogation was

Case 2:10-cr-00217-KJN   Document 16   Filed 12/03/10   Page 25 of 26


defendant informed that he was free to leave.  The detention in handcuffs for the majority of the stop, and the questioning of defendant while handcuffed, militates in favor of finding that defendant was in custody for <u>Miranda</u> purposes.

Under the totality of the circumstances, the undersigned concludes that the objective facts of this detention and interrogation indicate that defendant was in custody at the time he provided incriminating or potentially incriminating statements regarding responsibility for the drugs and alcohol found in his vehicle.  The objective circumstances of the interrogation lead to the conclusion that the officers here restrained defendant's freedom of movement to a degree associated with a formal arrest and that a reasonable person would not have felt free to leave.  Thus, Officer Staton was required to provide defendant with <u>Miranda</u> warnings prior to interrogating him.  He did not.  Accordingly, the undersigned will order that defendant's statements regarding the marijuana and alcohol found in the vehicle be suppressed.

III.    <u>CONCLUSION</u>

For the reasons stated above, IT IS HEREBY ORDERED that:

1.    Defendant's motion to suppress (Dkt. No. 7) is granted in part and denied in part.

2.    Evidence of the marijuana and the open container of alcohol found in defendant's vehicle is not suppressed.  However, all of plaintiff's statements regarding his actual ownership, potential ownership, or responsibility for the marijuana and open container of alcohol found in the vehicle are suppressed.

3.    Counsel for the parties shall appear at a status conference before the undersigned on December 15, 2010, at 9:00 a.m.  Defendant's appearance may be excused at that status conference.

////

////

////

25

IT IS SO ORDERED.

DATED:  December 2, 2010

_____
KENDALL J. NEWMAN
UNITED STATES MAGISTRATE JUDGE